390 F.3d 1139
In re George E. DAWSON and Barbara J. Dawson, Debtors.George Dawson and Barbara J. Dawson, Plaintiffs-Appellants,v.Washington Mutual Bank, F.A., successor to Great Western Bank, Defendant-Appellee.
No. 02-16903.
United States Court of Appeals, Ninth Circuit.
Argued March 10, 2004.
Resubmitted April 23, 2004.
Decided December 10, 2004.

COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED A. Charles Dell'Ario, Oakland, CA, for the plaintiffs-appellants.
William G. Malcolm, Malcolm Cisneros, Irvine, CA, for the defendant-appellee.
Appeal from the United States District Court for the Northern District of California; Claudia Wilken, District Judge, Presiding. D.C. No. CV-01-02367-CW.
Before: HALL and GRABER, Circuit Judges, and WEINER,* Senior District Judge.
GRABER, Circuit Judge.

1
The main question in this case is whether a debtor may recover damages for emotional distress under 11 U.S.C. § 362(h) when a creditor violates the automatic stay that follows from the filing of a bankruptcy petition. In a previous opinion, Dawson v. Washington Mutual Bank, F.A., 367 F.3d 1174 (9th Cir.), withdrawn, 385 F.3d 1194 (9th Cir.2004), we answered that question "no." Upon reconsideration, however, we are persuaded that we erred and now answer "yes."

FACTUAL AND PROCEDURAL BACKGROUND

2
Plaintiffs George and Barbara Dawson bought a home located at 3490 Ridgewood Way, in Richmond, California ("the Property"). When they acquired the Property in 1987, they obtained from the predecessor of Defendant Washington Mutual Bank ("the Bank") a loan secured by a first deed of trust. In 1989, Plaintiffs executed a second deed of trust, to secure an obligation of $40,000, in favor of the Dixons, who were friends of Plaintiffs.

3
Beginning in 1993, Plaintiffs experienced difficulty in making their monthly mortgage payments to the Bank. On May 18, 1993, Plaintiffs filed a Chapter 13 bankruptcy petition and, in October of the same year, the Chapter 13 plan was confirmed.

4
Plaintiffs again failed to pay what they owed the Bank and, on July 1, 1994, the Bank filed a motion for relief from the automatic bankruptcy stay, 11 U.S.C. § 362. The Bank obtained an "adequate protection" order providing that the automatic stay would terminate on August 18, 1994, if Plaintiffs failed to make certain payments. They did fail to make the required payments; accordingly, the stay terminated. A foreclosure sale was scheduled for early 1995 but Plaintiffs tendered payment to the Bank just before the date set for the sale, so the foreclosure proceedings were discontinued.

5
In 1995 Plaintiffs made payments to the Bank, but for less than the amount due. Thus, on October 2, 1995, the Bank recorded a notice of default. On January 16, 1996, the Bank recorded a notice of sale, stating that a foreclosure sale would take place on February 8, 1996.

6
Meanwhile, in 1994 the Dixons had recorded a notice of default against the Property. On October 12, 1995, a foreclosure sale was conducted. On February 5, 1996, (a) a trustee's deed upon sale, transferring title to the Dixons, was recorded, 16716 and (b) the Dixons assigned the second deed of trust, transferring their interest, to relatives of Plaintiffs, the Jamesons. Plaintiffs and the Jamesons signed an unrecorded agreement entitled "Agreement Re: Foreclosure on 3490 Ridgewood Way, Richmond, California" ("the Jameson Agreement"). The Jameson Agreement provided that, after the Dixons' foreclosure of the property was complete and title was vested in the Jamesons: (1) Plaintiffs would "cure the foreclosure on the first deed of trust" and keep payments current thereafter; (2) Plaintiffs would arrange for a second loan to be secured by loan officer Joan Foggy, with the funds to be distributed as follows: (a) to the Jamesons, $45,000 plus fees, expenses, and $1,000 for their time and effort; and (b) to Plaintiff George Dawson's father, $12,000; with (c) any remainder to Plaintiffs; and (3) when the foregoing conditions were fulfilled, the Jamesons would deed the property to Plaintiffs. The Jameson Agreement provided for completion of all conditions within 30 working days from the date of execution.

7
On February 8, 1996, a grant deed was recorded, transferring the Dixons' interest in the property to the Jamesons. That was the same date set for the foreclosure sale. The sale did occur and the Bank took title to the Property on February 14, 1996. The Bank rescinded the foreclosure sale on August 8, 1996.

8
Just before the sale, on February 6, Plaintiff George Dawson had filed a Chapter 7 bankruptcy petition. Whether or when notice of that petition was provided to the Bank was in dispute below, but the bankruptcy court found that the Bank had knowledge of it by February 20, 1996, at the latest. On that date the Bank served on Plaintiffs a notice to quit the premises.

9
On February 27, 1996, the Bank instituted an unlawful detainer action against Plaintiffs. The Bank's lawyer in the unlawful detainer action received notice of the Chapter 7 bankruptcy filing on the same day, February 27. The Bank dismissed the unlawful detainer action on March 14, 1996. Plaintiff George Dawson's Chapter 7 bankruptcy case was closed on July 23, 1996.

10
Plaintiffs filed the present Chapter 13 bankruptcy case on June 2, 1998. The Bank filed a proof of claim as to Plaintiffs' debt, secured by the Property. Thereafter, Plaintiffs filed an adversary complaint, claiming (as relevant here) emotional distress damages under 11 U.S.C. § 362(h) for the Bank's violation of the automatic stay in George Dawson's Chapter 7 proceeding.

11
The bankruptcy court held, among other things, that the Jameson Agreement was an option agreement that did not convey any equitable ownership interest in the property to Plaintiffs and that the Bank's February 1996 foreclosure sale, therefore, did not violate the automatic stay. Because the February 1996 foreclosure sale was not wrongful, the bankruptcy court awarded the remedy of rescission and restored the parties to their prior positions as if that sale had never occurred. As part of this remedy, the bankruptcy court held that Plaintiffs owed the Bank for loan payments that accrued between February and August 1996 (when the Bank rescinded the sale). Further, the bankruptcy court held that the Bank did violate the stay between February 20 and March 14, 1996 (when the Bank dismissed the unlawful detainer action). The court nonetheless denied George Dawson's claim for emotional distress damages on the grounds that the Bank's violation of the automatic stay was not egregious and that no evidence corroborated the emotional distress claimed. Finally, the bankruptcy court awarded Plaintiffs attorney fees and costs in the amount of $2,307.60.

12
The district court affirmed all the bankruptcy court's holdings save one. The court held that the Jameson Agreement was actually a marketing contract that could transfer an equitable interest in the property to Plaintiffs. Therefore, the Bank may have violated the automatic stay with its February 1996 foreclosure sale, because Plaintiffs may have had an equitable interest in the property at the time. However, whether they actually held such an interest depended on several facts (such as whether the Jameson Agreement's requirements had been fulfilled) that were in dispute. Therefore, the district court remanded the case to the bankruptcy court for further findings on this and related issues.

Plaintiffs timely appealed to this court.1
STANDARDS OF REVIEW

13
We review de novo a district court's decision on appeal from a bankruptcy court. Batlan v. TransAm. Commercial Fin. Corp. (In re Smith's Home Furnishings, Inc.), 265 F.3d 959, 962-63 (9th Cir.2001). That is, we review the bankruptcy court's decision independently and give no deference to the district court's determinations. Id. at 963.

14
We review for clear error the bankruptcy court's findings of fact, but we review de novo its conclusions of law. Id.

15
A bankruptcy court's award of attorney fees is reviewed for abuse of discretion or erroneous application of the law. Cal. Employment Dev. Dep't v. Taxel (In re Del Mission Ltd.), 98 F.3d 1147, 1152 (9th Cir.1996).

DISCUSSION
A. Jurisdiction

16
As a threshold matter, the Bank asserts that we lack jurisdiction because the district court's order is not "final" within the meaning of 28 U.S.C. §§ 158(d) and 1291. We have acknowledged that "questions regarding finality sometimes arise when, as here, a district court reverses a final order of a bankruptcy court but also remands for further proceedings." N. Slope Borough v. Barstow (In re Bankr.Estate of MarkAir, Inc.), 308 F.3d 1057, 1060 (9th Cir.2002).

17
We resolve such questions of finality through a pragmatic approach; a district court's decision can be considered final for the purpose of appellate review even when a question has been remanded to the bankruptcy court.

18
If the matters on remand concern primarily factual issues about which there is no dispute, and the appeal concerns a question of law, then the policies of judicial efficiency and finality are best served by our resolving the question now. On the other hand, if the district court remands for further factual findings related to a central issue raised on appeal, the district court's decision is usually not final.

19
Id. (citations and internal quotation marks omitted).

20
At first blush, that passage might appear to suggest that we lack jurisdiction. The district court reversed the bankruptcy on a central issue in the case, viz., whether the Jameson Agreement transferred equitable title in the property to Plaintiffs, and remanded the case for further factual findings. But this appeal concerns primarily a question of law, and indeed a question of first impression in the Ninth Circuit: When, if ever, are damages for emotional distress recoverable under 11 U.S.C. § 362(h) for a violation of the automatic stay? Our answer will not obviate the need for all further fact-finding, but it will materially aid the bankruptcy court in reaching its disposition on remand. See MarkAir, Inc., 308 F.3d at 1060.2 If the bankruptcy court were to find that the foreclosure sale violated the automatic stay, for example, the question of what damages are available would be amplified.

21
In the circumstances, we conclude that the district court's order is "final" within the meaning of 28 U.S.C. §§ 158(d) and 1291. Accordingly, we have jurisdiction and proceed to the merits.

B. Claim for Emotional Distress Damages

22
Plaintiffs argue that the district court erred in affirming the bankruptcy court's refusal to award damages to George Dawson for emotional distress allegedly arising out of the unlawful detainer action. They rely on 11 U.S.C. § 362(h): "An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." (Emphasis added.) See Stinson v. Bi-Rite Supply, Inc. (In re Stinson), 295 B.R. 109, 119-20 (B.A.P. 9th Cir.2003) (holding that emotional distress damages are available under § 362(h) and following Aiello v. Providian Fin. Corp., 239 F.3d 876, 878 (7th Cir.2001)).

23
To analyze Plaintiffs' position we must determine whether Congress intended the term "actual damages" in § 362(h) to include damages for emotional distress. We begin with the text of the statute, but it does not provide a definition for "actual damages." There is a contextual clue, however, that lends support to Plaintiffs' theoretical position.

24
Congress chose the term "individual" to describe those who are eligible to claim actual damages under § 362(h). The statute allows any "individual," including a creditor, to recover damages. So, for example, if a willful violation of the automatic stay damages some portion of the bankruptcy estate, both the debtor and an individual creditor of the now less-valuable estate may recover actual damages. See Johnston Envtl. Corp. v. Knight (In re Goodman), 991 F.2d 613, 618 (9th Cir.1993) ("Normally pre-petition creditors ... shall recover damages under 11 U.S.C. § 362(h) ... for willful violations of the automatic stay."). But corporations, whether debtors or creditors, are not "individuals" for the purposes of this statute. See id. at 618-20 ("`[I]ndividual' means individual, and not a corporation or other artificial entity."); United States v. Arkison (In re Cascade Roads, Inc.), 34 F.3d 756, 766 (9th Cir.1994) ("[C]orporate debtors may not recover sanctions under section 362(h) because the statute refers only to `individual [s] ....'"). By limiting the availability of actual damages under § 362(h) to individuals, Congress signaled its special interest in redressing harms that are unique to human beings. One such harm is emotional distress, which can be suffered by individuals but not by organizations.

25
Even after examining the text and context of § 362(h), however, its meaning remains ambiguous. Recourse to legislative history is therefore an appropriate tool in determining Congress' intent. Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc., 180 F.3d 1072, 1080 (9th Cir.1999).3

26
Through the automatic stay, Congress was furthering more than one goal. We have explained that "[t]he purpose of the automatic stay provision is two-fold. By halting all collection efforts, it gives the debtor a breathing spell from his creditors during which the debtor can try to reorganize. By preventing creditors from pursuing, to the detriment of others, their own remedies against the debtors' property the stay protects creditors." United States v. Dos Cabezas Corp., 995 F.2d 1486, 1491 (9th Cir.1993) (alteration and internal quotation marks omitted). Under that formulation the stay's "two-fold" purpose, id., is not merely for debtors and creditors; the stay also is meant to achieve financial and non-financial goals. Plainly one aim of the automatic stay is financial: the stay gives the debtor time to put finances back in order, offers the debtor an opportunity to reorganize so that creditors can be satisfied to the greatest extent possible, and prevents creditors from racing to devour the debtor's estate at the expense of fellow creditors. But another purpose is to create a "breathing spell," id., a phrase suggesting a human side to the bankruptcy process.

27
Our formulation in Dos Cabezas faithfully reflects the legislative history which, although it focuses mainly on the financial effects of a violation of the automatic stay, also refers to non-financial harms that may befall a debtor. The House Report for the Bankruptcy Reform Act of 1978 explained:

28
The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.

29
The automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors. Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally. A race of diligence by creditors for the debtor's assets prevents that.

30
H.R.Rep. No. 95-595, at 340 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6296-97; see also S.Rep. No. 95-989, at 54-55 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5840-41 (same first paragraph). The House Report went on to say:

31
The stay is the first part of bankruptcy relief, for it gives the debtor a respite from the forces that led him to bankruptcy. Frequently, a consumer debtor is severely harassed by his creditors when he falls behind in payments on loans. The harassment takes the form of abusive phone calls at all hours, including at work, threats of court action, attacks on the debtor's reputation, and so on. The automatic stay at the commencement of the case takes the pressure off the debtor.

32
H.R.Rep. No. 95-595, at 125-26, reprinted in 1978 U.S.C.C.A.N. 5963, 6086-87 (footnote omitted). A footnote to that passage directs the reader to an Appendix in which a lawyer for the Federal Trade Commission further detailed abuses to which consumer creditors are frequently subjected:

33
When a payment is missed, letters and phone calls commence. Communications are directed at first to the debtor himself... and then frequently to members of the debtor's family, friends and neighbors, and to the debtor's employer.... Possible use of the wage assignment may be mentioned together with the suggestion that employers don't like deadbeats and tend to discharge employees who generate trouble.

34
H.R.Rep. No. 95-595, at 169, reprinted in 1978 U.S.C.C.A.N. 5963, 6130. The Appendix continued:

35
The consumer who seeks the relief of a bankruptcy court is an individual who is in desperate trouble.... The short term future that he faces can literally destroy the basic integrity of his household. We believe that this individual is entitled to a focused and compassionate effort on the part of the legal system to alleviate otherwise insurmountable social and economic problems. We believe that relief should be provided with fairness to all concerned but with due regard to the dignity of the consumer as an individual who is in need of help.

36
H.R.Rep. No. 95-595, at 173, reprinted in 1978 U.S.C.C.A.N. 5963, 6134.

37
Reading the legislative history as a whole, we are convinced that Congress was concerned not only with financial loss, but also — at least in part — with the emotional and psychological toll that a violation of a stay can exact from an 16725 individual. Because Congress meant for the automatic stay to protect more than financial interests, it makes sense to conclude that harm done to those non-financial interests by a violation are cognizable as "actual damages." We conclude, then, that the "actual damages" that may be recovered by an individual who is injured by a willful violation of the automatic stay,4 11 U.S.C. § 362(h), include damages for emotional distress. In so holding, we join an emerging consensus recognizing the availability of damages for emotional distress that results specifically from a willful violation of the automatic stay. See McCullough, Emotional Distress Damages: Should They Be Permitted Under the Bankruptcy Code for a Willful Violation of the Stay?, 1 DePaul Bus. & Com. L.J. 339 (Spring 2003) (collecting cases and citing Aiello, 239 F.3d 876, and Fleet Mortgage Group, Inc. v. Kaneb, 196 F.3d 265 (1st Cir.1999)); Thurmond & Bleming, Do Section 362(h) "Actual Damages" Include Emotional Distress Damages?, Norton Bankruptcy Law Adviser No. 9 (Sept.2004) (collecting cases and concluding that a majority of courts "include emotional distress damages in actual damages awarded under § 362(h) only when the debtor meets certain proof requirements," including proof of significant damages and proximate cause).

38
Because we hold that, under § 362(h), emotional distress damages are cognizable, we turn next to the standard that applies to such a claim. We hold that a claim for emotional distress damages is available if the individual provides clear evidence to establish that significant harm occurred as a result of the violation, a standard on which we will elaborate below. The Seventh Circuit, in Aiello, 239 F.3d at 880, required that an individual suffer a financial loss in order to claim emotional distress damages.5 It held that emotional distress damages were not compensable on their own because the purpose of the Bankruptcy Code is to protect financial interests and because emotional distress claims are so easily manufactured. Id. at 880. We decline to follow that reasoning because we have concluded that the purpose of § 362(h) encompasses more than protection of financial interests and because that statute does not suggest that any one form of damages is dependent on the existence of another form of damages.

39
Although pecuniary loss is not required in order to claim emotional distress damages, not every willful violation merits compensation for emotional distress. Like the Aiello court, 293 F.3d at 880, we are concerned with limiting frivolous claims. To that end, we hold that, to be entitled to damages for emotional distress under § 362(h), an individual must (1) suffer significant harm, (2) clearly establish the significant harm, and (3) demonstrate a causal connection between that significant harm and the violation of the automatic stay (as distinct, for instance, from the anxiety and pressures inherent in the bankruptcy process). In so holding, we join a number of other courts that have adopted similar standards.

40
Fleeting or trivial anxiety or distress does not suffice to support an award; instead, an individual must suffer significant emotional harm. See, e.g., In re Skeen, 248 B.R. 312, 319 (Bankr.E.D.Tenn.2000) (holding that "`[b]ecause the emotional distress suffered... was fleeting, inconsequential, and medically insignificant,... it is not compensable'") (alteration in original) (quoting Crispell v. Landmark Bank, (In re Crispell), 73 B.R. 375, 380 (Bankr.E.D.Mo.1987)).

41
Consequently, it must be clear that the individual suffered significant emotional harm. An individual may establish emotional distress damages clearly in several different ways.

42
• Corroborating medical evidence may be offered. See, e.g., In re Briggs, 143 B.R. 438, 463 (Bankr.E.D.Mich.1992) (requiring specific and definite evidence to establish an emotional distress claim arising from violation of the automatic stay); Stinson, 295 B.R. at 120 n. 8 ("The majority of the courts have denied damages for emotional distress where there is no medical or other hard evidence to show something more than a fleeting or inconsequential injury." (internal quotation marks omitted)); Diviney v. NationsBank of Tex. (In re Diviney), 211 B.R. 951, 967 (Bankr.N.D.Okla.1997) (holding that, where emotional distress seemed trivial and no medical evidence corroborated the claim, damages for emotional distress were not warranted).

43
• Non-experts, such as family members, friends, or coworkers, may testify to manifestations of mental anguish and clearly establish that significant emotional harm occurred. See, e.g., Varela v. Ocasio (In re Ocasio), 272 B.R. 815, 821-22 (B.A.P. 1st Cir.2002) (per curiam) (holding that testimony from the debtor's wife — that he suffered from headaches, did not feel well for a week, and went to the doctor to have his nerves checked — was sufficient to support emotional distress damages of $1,000 without medical testimony).

44
• In some cases significant emotional distress may be readily apparent even without corroborative evidence. For instance, the violator may have engaged in egregious conduct. See, e.g., Wagner v. Ivory (In re Wagner), 74 B.R. 898, 905 (Bankr.E.D.Pa.1987) (awarding emotional distress damages, based on the debtor's testimony, when a creditor entered the debtor's home at night, doused the lights, and pretended to hold a gun to the debtor's head). Or, even if the violation of the automatic stay was not egregious, the circumstances may make it obvious that a reasonable person would suffer significant emotional harm. See, e.g., United States v. Flynn (In re Flynn), 185 B.R. 89, 93 (S.D.Ga.1995) (affirming $5,000 award of emotional distress damages, with no mention of corroborating testimony, because "it is clear that appellee suffered emotional harm" when she was forced to cancel her son's birthday party because her checking account had been frozen, even though the stay violation was brief and not egregious).

45
Our third requirement, that of a nexus between the claimed damages and the violation of the stay, appears in the statute itself. The individual must be "injured by" the violation to be eligible to claim actual damages. 11 U.S.C. § 362(h). See, e.g., Bishop v. U.S. Bank/Firstar Bank, N.A. (In re Bishop), 296 B.R. 890, 897 (Bankr.S.D.Ga.2003) (stating that, where emotional distress and willful conduct are established, the causal link between the violator's acts and the harm must be clearly established or readily apparent).

46
Having now set the appropriate standards, we apply them to this case. We review for clear error the bankruptcy court's findings of fact, Batlan, 265 F.3d at 962-63, and review for abuse of discretion the court's decision whether to award emotional distress damages and, if so, how much to award. See Smith v. Edwards & Hale, Ltd. (In re Smith), 317 F.3d 918, 923 (9th Cir.2002) (reviewing for abuse of discretion a bankruptcy court's award of attorney fees); Renwick v. Bennett (In re Bennett), 298 F.3d 1059, 1069 (9th Cir.2002) (reviewing for abuse of discretion a bankruptcy court's decision to impose sanctions).

47
Plaintiff, George Dawson, claimed that he suffered psychological and emotional effects as a result of the Bank's violation of the stay. In refusing to award damages, the bankruptcy court concluded that "there was no corroborating evidence." That finding is not clearly erroneous. George Dawson provided a declaration describing his alleged emotional distress. His wife submitted a declaration describing the emotional distress that she allegedly suffered, but she was not a debtor whose damages could be compensable under § 362(h), and she did not give evidence relating to her husband's alleged distress. No other evidence was presented on the issue of emotional distress.

48
The bankruptcy court also found that the Bank's violation of the stay was not egregious. That finding, likewise, is not clearly erroneous. The violation was brief and minor.

49
But the bankruptcy court went on to apply the "rule of law suggested by the district court in Aiello [v. Providian Financial Corp., 257 B.R. 245 (N.D.Ill.2000),]" and to hold that corroborating evidence was required because the Bank's violation of the automatic stay was not egregious. As we have explained, an individual can prove entitlement to emotional distress damages even in the absence of corroborating evidence and even in the absence of an egregious violation, if the individual in fact suffered significant emotional harm and the circumstances surrounding the violation make it obvious that a reasonable person would suffer significant emotional harm. The bankruptcy court did not have the benefit of our opinion and, consequently, failed to consider that possibility. That is, the court applied an incorrect legal standard. The use of an incorrect legal standard is per se an abuse of discretion. Debbie Reynolds Hotel & Casino, Inc. v. Calstar Corp. (In re Debbie Reynolds Hotel & Casino, Inc.), 255 F.3d 1061, 1065 (9th Cir.2001). Accordingly, we must reverse and remand for reconsideration.

C. Rescission

50
Plaintiffs next claim that the district court erred in affirming the bankruptcy court's holding that Plaintiffs were responsible for mortgage and tax payments on the Property from February to August of 1996. We disagree.

51
First, Plaintiffs argue that it is a basic tenet of California real property law that a trustee's sale extinguishes the underlying note and deed of trust. See Alliance Mortgage Co. v. Rothwell, 10 Cal.4th 1226, 44 Cal.Rptr.2d 352, 900 P.2d 601, 608 (1995). Plaintiffs reason that, because the February 8, 1996, sale extinguished Defendant's note on the property, they owed no payments thereafter.

52
Plaintiffs' arguments on this point are unpersuasive. California rescission law empowers a court to undo a transaction and restore the parties to the status quo ante. That is precisely what the bankruptcy court did here — the court undid the foreclosure and thereby placed the parties in the positions they occupied before the February foreclosure.

53
Plaintiffs also argue that, because rescission under California law restores the parties to their status on the early morning hours of February 8, 1996, they owe the Bank no payments for later months in 1996 because no such payments were due on February 8. If that view were correct, and if rescission restored the parties permanently to a single moment of the status quo ante, then Plaintiffs would never again owe any payment on the Property, as there is nothing to limit the logic of Plaintiffs' argument to the period between February and August 1996. It is true that, on February 8, 1996, Plaintiffs did not owe payments for March, April, May, June, July, or August 1996. However, it is equally true that Plaintiffs were, on February 8, parties to a loan agreement that they knew would obligate them to make payments on the Property as each of those months arrived. Plaintiffs seek a windfall (the elimination of the future obligation that existed at the status quo ante) to which they are not entitled.

54
Second, Plaintiffs argue that the court's ruling is fundamentally unfair. The ruling could have been unfair if Plaintiffs 16731 were obliged to pay penalties for not remitting payment during the months Defendant purported to own the property. The bankruptcy court clearly ruled, however, that Defendant was not entitled to any penalties. The bankruptcy court held that Defendant "is entitled to the mortgage payments that accrued and to reimbursement of any real property tax advances during the period." The district court affirmed that holding, and it did not err in doing so.

55
We therefore affirm the bankruptcy court's determination that Plaintiffs are responsible for payments accrued between February 8, 1996, and August 8, 1996.

D. Attorney Fees

56
Plaintiffs claimed more than $50,000 in attorney fees. They sought fees in connection with George Dawson's Chapter 7 case and also in connection with the present case.

57
On the Chapter 7 claim, the bankruptcy court held that Plaintiffs were entitled to fees generated in obtaining dismissal of the unlawful detainer action. The court held that only an hour of attorney time was required to remedy the stay violation and awarded Plaintiffs $200. Plaintiffs did not appeal this portion of the fee award.

58
With respect to the present case, the bankruptcy court ruled that Plaintiffs were entitled to some fees because they had established a single item of damages: the $200 award. However, the court found Plaintiffs' request to be "grossly disproportionate to the cost of litigating the issue in question." Observing that Plaintiffs prevailed on only 1 of 20 issues, the court awarded one-twentieth of Plaintiffs' costs and fees in litigating the action. The bankruptcy court also held that the hourly rate actually charged by Plaintiffs' counsel represented the reasonable value of his services. The court therefore divided the total fees and costs incurred in the action ($42,152.12) by 20, arriving at the sum of $2,107.60. Adding in the $200 from the Chapter 7 case, the total award was $2,307.60.

59
The district court held that the bankruptcy court did not abuse its discretion in determining the amount of attorney fees and costs to which Plaintiffs were entitled. The district court further held that if, on remand, the bankruptcy court finds that the Bank's foreclosure sale violated the automatic stay, the bankruptcy court will have to decide whether Plaintiffs are entitled to a larger award of fees.

60
On appeal to us, Plaintiffs argue that the bankruptcy court erred in calculating both the time that counsel reasonably expended and the hourly rate. We are not convinced by Plaintiffs' arguments.

61
As to the time expended, Plaintiffs' counsel gave only a rough estimate of what proportion of the total time in the case related to the single successful issue. That estimate was not corroborated and the bankruptcy court was entitled to find that the estimate substantially overstated the hours reasonably expended on the unlawful detainer issue. "Substantively, both the Supreme Court and our cases have emphasized the discretionary nature of the court's determination of the number of hours reasonably expended." Cunningham v. County of L.A., 879 F.2d 481, 484 (9th Cir.1988). Cunningham also explains that inadequate documentation is a factor the court properly may consider in assessing the appropriate number of hours. Additionally, even where evidence supports a particular number of hours worked, the court may give credit for fewer hours if the time claimed is "excessive, redundant, or otherwise unnecessary." Id. at 484 (internal quotation marks omitted). The court did not abuse its discretion in determining that the reasonable amount of time spent on the unlawful detainer issue represented five percent of counsel's total time.

62
With respect to the hourly rate, the bankruptcy court did not assume that the charged rate was the appropriate lodestar rate only because it was the rate actually charged. Cf. Cedic Dev. Co. v. Warnicke (In re Cedic Dev. Co.), 219 F.3d 1115, 1117 (9th Cir.2000) (reversing a fee determination when the rates actually charged "were bargain rates"). Rather, the bankruptcy court considered the quality and efficiency of counsel's services. The court's conclusion that $200 per hour was a reasonable rate is not an abuse of discretion.

63
In short, the bankruptcy court and district court permissibly calculated fees and costs. As the district court noted, a recalculation may be required as a result of the remand to the bankruptcy court, but no error in the award of fees and costs appears to date.

64
AFFIRMED in part; REVERSED and REMANDED in part. The parties shall bear their own costs on appeal.

Notes:

*
The Honorable Charles R. Weiner, Senior Judge, United States District Court for the Eastern District of Pennsylvania, sitting by designation

1
The Bank filed no cross-appeal. Therefore, the Bank's argument that we shouldreverse the district court's holding that Plaintiffs held equitable title to the Property is not properly before us. See El Paso Natural Gas Co. v. Neztsosie, 526 U.S. 473, 479, 119 S.Ct. 1430, 143 L.Ed.2d 635 (1999) (holding that, in the absence of a cross-appeal, an appellee may urge affirmance of the lower court's ruling on any basis appearing in the record, "but may not attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary" (internal quotation marks omitted)).

2
The Bank relies onStanley v. Crossland, Crossland, Chambers, MacArthur & Lastreto (In re Lakeshore Vill. Resort, Ltd.), 81 F.3d 103 (9th Cir.1996). There, we held that we lacked jurisdiction over an appeal from a district court order vacating and remanding a bankruptcy court's order. However, there is no suggestion in Lakeshore that a novel question of law, which would affect the disposition of the case on remand, was presented.

3
In our now-withdrawn opinion we relied by analogy on cases holding that "actual damages," under certain federal statutes, do not include damages for emotional distressSee Mackie v. Rieser, 296 F.3d 909, 917 (9th Cir.2002) (interpreting "actual damages" in the context of the Copyright Act to cover only economic damages); Ryan v. Foster & Marshall, Inc., 556 F.2d 460, 464 (9th Cir.1977) (holding similarly under the Securities Act). Yet we also have held that the term "actual damages" under other federal statutes, does include damages for emotional distress. See Guimond v. Trans Union Credit Info. Co., 45 F.3d 1329, 1332-33 (9th Cir.1995) (holding that damages for emotional distress were available under the Fair Credit Reporting Act where the plaintiff suffered from sleeplessness, nervousness, frustration, and mental anguish as a result of the statutory violation); Anderson v. United Finance Co., 666 F.2d 1274, 1277 (9th Cir.1982) (holding that "actual damages" under the Equal Credit Opportunity Act may include damages for "mental anguish, humiliation or embarrassment"). Because the question in each instance is what Congress intended in enacting the particular statute at issue, we find little assistance in analogizing to different laws passed at different times and, instead, analyze the Bankruptcy Reform Act of 1978.

4
For the purpose of this appeal there is no dispute that the Bank willfully violated the automatic stay from February 20, 1996, to March 14, 1996See Goichman v. Bloom (In re Bloom), 875 F.2d 224, 227 (9th Cir.1989) (defining "willful violation" of the automatic stay).

5
The majority inStinson relied on our decision in Pershing Park Villas Homeowners Ass'n v. United Pac. Ins. Co., 219 F.3d 895, 903 (9th Cir.2000), to support its holding that financial damages must accrue before an individual may assert a claim for emotional distress damages arising from a violation of the automatic stay. Stinson, 295 B.R. at 121-22. However, Pershing Park applied California state law to an insurance claim and so is inapplicable in the present context.